### The State of Iowa v. Neeley.

1. **Indictment: MURDER: MALICE AFORETHOUGHT.** An indictment for murder in the second degree charged that the offense was committed "with *intent* in so doing, then and there feloniously, intentionally, willfully, maliciously and deliberately to kill and murder," &c.: *Held*, That the charge necessarily implied, to the common understanding, malice aforethought, and that, under the statute, the offense was sufficiently charged.

2. **Criminal law: INTENT: INSTRUCTION.** An instruction asked on the trial of a criminal cause, which would place the question of the defendant's intent upon a state of facts, which, though true, would not exclude the conclusion that he had, in fact, the intent, was properly refused.

3. —— **DEFENSE: DANGER.** On the trial of an indictment for murder, the court instructed the jury that to sustain the plea of self defense the defendant must show that the deceased " assaulted him and that the assault was eminently perilous, and the damage to the defendant *actual* and urgent: *Held,* That the word *actual* did not imply that the danger must have *existed in fact* — that it implied danger apparent to the defendant's comprehension — and that it did not vitiate the instruction.

4. —— **PROVOCATION.** When the defendant, on trial for murder, sought the deceased with a loaded gun, with the view of provoking a difficulty, or with the intent of having an affray, and a difficulty did ensue, he cannot, without some proof of a change of conduct or action, excuse the homicide on the ground that the deceased fired the first shot.

*Appeal from Polk District Court.*

MONDAY, FEBRUARY 5.

THE indictment charges the prisoner with *murder in the second degree*, as follows: that on the 1st day of August, 1864, the prisoner shot, &c., Patrick Casady, "with *intent* in so doing then and there and thereby, *feloniously, intentionally, willfully, maliciously and deliberately* to kill and murder him the said Patrick Casady, and then and there and thereby the said James Neely *feloniously, intentionally, willfully*, maliciously and deliberately did shoot and kill and murder the said Patrick Casady contrary, &c." Plea, "not guilty." Trial, verdict of guilty. Motions in arrest and for a new trial, overruled. The prisoner was sentenced to the penitentiary for fifteen years, and because of various alleged errors, which will be found referred to in the opinion, prosecutes this appeal.

*Finch, Clark & Rice* for the appellant.

*F. E. Bissell,* Attorney-General, for the State.

WRIGHT, J. — I. The defendant first insists that the indictment is defective in failing to charge that the homi-

**1. INDICT-
MENT: mur-
der: malice
afore-
thought.**

cide was perpetrated with "*malice aforethought,*" or by the use of words of similar import. No objection was made to the indictment at any stage of the proceedings in the court below. However essential these words were at common law, our opinion is, that under the statute this indictment sufficiently charges murder in the second degree. It seems to us that no one can read it, in connection with the statutory definition of this offense, without at once being brought almost irresistibly to the conclusion that the defect complained of could not possibly have tended to prejudice any of the prisoner's substantial rights. If the killing was felonious, intentional, willful, malicious and deliberate, it only needed the element of being premeditated to make it murder in the first degree. And the use of these words imply necessarily, to the common understanding, malice aforethought. If so, this is all that is required, and especially where the question is raised for the first time in this court. Rev., §§ 4191, 4192, 4193, 4649, 4660, 4925. The case of *The State of Iowa* v. *Johnson,* 8 Iowa, 528, cited by counsel, is not in conflict with this view. And the same is true of *Fouts* v. *The State,* 4 G. Greene, 500, and especially where these two cases are considered together.

II. Objections are urged to several instructions given for the State, and to the refusal of others asked by the defendant. Before considering these, a brief reference to the general facts becomes material. The prisoner and the deceased lived on adjoining farms, the latter making

his home with his mother. The families were not on friendly terms. The fences around the farm of Mrs. Casady were bad; the prisoner's, as also the stock of others, broke through occasionally and were injured by dogs, and otherwise. On the morning of the day of the homicide, the prisoner, influenced by the belief that his hogs were being injured by dogs; went with his gun to the field, where some children belonging to the Casady family were, and shot their dog or one belonging to the family. Mrs. Casady and her daughter afterwards went to the house of the prisoner, where an angry altercation ensued, and they returned to their home. As to all that took place at this altercation the witnesses differ, and it is not material to refer to it in detail.

After this, and late in the afternoon, hogs were again heard in the field, apparently being worried by dogs, and the prisoner hurried there with his gun; and, according to the testimony of the State, pursued the sister of the deceased and the children through the field, in the direction of their house. On their return home, upon telling their story, the deceased, who was ill from an injury received on the day before (but of which the prisoner knew nothing, nor did he know that he was at home), with his mother and sister, left the house and passed down to the field; the deceased having with him a small rifle gun. In the meantime the defendant had left the field and gone in an almost opposite direction from the other parties about two-thirds of the way to his own house, a distance, perhaps, of sixty or seventy rods. The other parties were now passing along a path inside of the fence. At this time some of the witnesses say that a shot was fired in the field, while others heard nothing of it. The prisoner, either because he heard a shot, or saw the deceased and his mother and sister, or for some cause not developed, turned and walked hurriedly back to where they were. When within a few feet of them

(eight or ten), and after, according to the testimony of the State, a few words had passed between them, the prisoner shot and killed Casady. The State claims that the shooting was without provocation, while the prisoner insists that he shot in self defense. He received a gun shot wound in his left hand. According to the testimony of some of the witnesses, who were some distance from the scene of the homicide, there was first heard the sharp crack of a rifle, then instantly the heavier sound of a musket or shot gun, and almost as quick after a third shot like the second. The prisoner had and fired a small double barrel shot gun; and the third shot was at a dog, according to some witnesses, and according to others, at Mrs. Casady. There is no positive testimony as to how the wound was inflicted on defendant's hand. The theory of the defense is, that Casady shot first and thus wounded the prisoner, which theory is expressly denied by the testimony of Mrs. Casady and her daughter, the only witnesses present, who state unequivocally that he did not fire nor offer to fire his gun. The wound is attempted to be accounted for by the State, upon the theory that as Casady fell (the shot was almost instantly mortal) his gun, which it is claimed he held near the muzzle, in falling was discharged, the shot passing through defendant's hand. That both barrels of defendant's gun were discharged at the time of the homicide is pretty well established. The shot in the field before he turned back, if there was one, is attempted to be accounted for by the presence of a third gun found near the scene, which it is claimed Mrs. King (the sister) had. She swears, however, positively, that this gun she brought from the house after the killing, to which place she went immediately after her brother was shot, for water, and without knowing the nature or character of his wounds or injuries. Witnesses differ as to whether there were two or three shots fired, but the weight of the testimony is in favor of three.

This is a general view of the facts condensed from seven or eight hundred pages of testimony.

I. Upon it the prisoner asked this instruction : " If the jury find, from the evidence, that after the first shot was fired down in the field, if such shot was in fact fired, and when the defendant turned back to go down along the fence to the place where the homicide is alleged to have been committed, he did not know that Patrick Casady was approaching with a loaded rifle, with a view to an encounter, if there was such an intent, by reason of the intervening fence, if there was such an intervening fence, and by the shadows of the trees, then the fact that defendant did go back to the place of homicide, is no evidence that the defendant went back to accept or to seek a fight with the deceased."

*2. CRIMI-NAL LAW: INTENT: instruction.*

This was refused, and we think properly. It could only tend to mislead and confuse the jury. Not only so, but it placed the question of the prisoner's intent, in returning, upon one state of facts, which, though true, would not exclude the conclusion that he had in fact the intent charged. Stripped of all extraneous matter, the instruction is, that if the prisoner did not know that the deceased was approaching with a loaded gun, with a view to an encounter, then the fact that he returned to the field, is no evidence that he had the intention to seek a fight; and yet, suppose he knew he was there, without the gun, might not the intention exist?

Or suppose he had no certain knowledge that the deceased was there, he might have returned with the general intention of having a difficulty with any one he might find, and, if so, the wrongful intent general, and not particular, in its object, would be material, in considering the question of the prisoner's guilt; and then, when we consider what is said about the fence and the trees, the

instruction becomes still further objectionable, and we are clearly of the opinion that it was properly refused.

II. This instruction was given at the request of the State : " To sustain the plea of self defense, the defendant

3. —— self must show that Patrick Casady assaulted him, defense: danger. and that the assault was imminently perilous, and the danger to the defendant *actual* and urgent." This instruction is objected to because of the use of the word *actual*. The very language employed, however, is sustained by the text of Wharton's Cr. Law, section 1020, and the authorities there cited, and also by the case of *The State* v. *Thompson*, 9 Iowa, 188, and when properly understood, there can be no doubt of its correctness. The inquiry is, was the danger actual to the defendant's comprehension; not whether the danger existed in fact, not whether injury was actually intended by the deceased, but was it evident or actual to the prisoner as compared with danger remote or problematical. Thus, to illustrate by the case supposed by PARKER, J., in the celebrated Selfridge case (Whart. Hom., 407 ; 1 *Bishop's Cr. Law*, 385), if Casady had rushed upon the defendant, while engaged in his peaceable pursuits, with a pistol in his outstretched arm, using violent menaces. against his life, and had approached near enough to wound or injure him, if the prisoner had shot before or at the instant the pistol was discharged, the danger to deceased would have been *actual*, though it had turned out that the pistol held and discharged by the deceased was loaded with powder merely, and that the real design was merely to terrify the prisoner. And yet in that case, the danger, in one sense, was not actual, while it was in another. The general proposition, with proper explanations and qualifications, as stated by Baron PARKE (*Rex* v. *Thurston*, 1 Den. C. C., 387), that " the guilt of the prisoner must depend on the circumstances as they appear to him," is not by any means denied. And

this doctrine was elsewhere, in the charge of the court in this case, very clearly and explicitly stated.

Defendant's error consists in placing an improper construction upon the word *actual;* a construction not warranted, and which other parts of the charge show the court did not intend. And the complaint made against the instruction, which stated the law upon the assumption that Casady fired the first shot under circumstances of supposed danger to his person, cannot avail, for it is based upon almost precisely a similar state of facts as that above given by PARKER, J. For the prisoner and for the State this rule, as applied to danger believed to be evident, was clearly stated; and there is, in our opinion, no ground for concluding that the jury could justly or fairly have been misled by the language of which counsel now complain. And this view is more apparent, when it is remembered that this was a personal conflict, a conflict, too, which the State claims was premeditated on the part of the prisoner. This claim leads to the consideration of the next error relied upon by the defendant.

III. This instruction was given at the request of the State: "If, therefore, the jury believe from the evidence that the defendant brought on the difficulty by voluntarily returning to the vicinity of the deceased, with a deadly weapon, for the purpose of provoking a difficulty, his plea of self-defense will be of no avail; and in that case it would make no difference who fired the first shot." Another instruction of the same purport was given, except that the words "with the intent of having an *affray*" were used instead of "for the purpose of provoking a difficulty." And the correctness of these instructions really presents the question of most doubt in the case. After due reflection, however, we have concluded that the law was correctly stated. And it is upon this plain principle that one cannot willingly and knowingly bring upon

*4. —— provocation.*

himself the very necessity which he sets up for his defense. What we mean is, that if the prisoner, with a loaded weapon, sought the deceased with the view of provoking a difficulty or with the intent of having an affray, and a difficulty did ensue, he cannot, without some proof of change of conduct or action, excuse the homicide upon the ground that the deceased fired the first shot. Here there is no pretense that deceased put into exercise any intention (if such existed) of withdrawing from the combat, which, according to the hypothesis of the instruction, he sought, but by seeking and continuing therein he brought upon himself the necessity of killing his fellow man. Under such circumstances the law will not hold him guiltless. 1 Hale P. C., 482; 1 Hawk P. C., 87; Bishop Cr. L., 648, 649; *State* v. *Hill*, 4 Dev. & Bat., 481; *People* v. *Stonecipe*, 6 Cal., 405; We remark, in conclusion on this point, that the use of the words "a difficulty" instead of *the* difficulty, cannot change the result, since the intention in this case, as in all others, must be understood as applying to the facts as developed on the trial, and not to a possible or hypothetical case.

It only remains to inquire whether the testimony warranted the verdict. We have examined it with all the care due to a case of so great importance to the prisoner. The offense is among the gravest known to our law; the prisoner stands committed to the penitentiary for the term of fifteen years. There are, it must be admitted, some circumstances of great weight, which render improbable the testimony of the principal witnesses on the part of the State. Of all these matters, however, the jury were the proper judges. The case seems to have been very carefully tried and ably defended by the prisoner's counsel. There is much conflict in the testimony. If the witnesses present at the homicide are to be believed, it was entirely unprovoked, and the prisoner should have suffered even a

severer penalty. The weight due to these statements was for the jury. And in a case turning upon so many conflicting circumstances, when so much depends upon the credibility of the several witnesses, where the jury after a patient, and as we are bound to presume, an impartial examination of the whole case, has felt compelled to conclude that the prisoner was guilty as charged, we could not within any of the cases heretofore decided, or upon any fair rule, interfere with the action of the court below in refusing to disturb the verdict.

Affirmed.